1        UNITED STATES DISTRICT COURT
         NORTHERN DISTRICT OF ILLINOIS
2            EASTERN DIVISION

3    PROMEGA CORPORATION,                    )
                                             )
4              Plaintiff,                     )
                                             )
5         vs.                                 )  No. 13 C 2333
                                             )
6    LIFE TECHNOLOGIES CORPORATION,           )
     et al.,                                  )  Chicago, Illinois
7                                             )  June 7, 2013
               Defendants.                    )  9:30 o'clock a.m.
8
                   TRANSCRIPT OF PROCEEDINGS -
9                    Continued Daubert Hearing
         BEFORE THE HONORABLE RICHARD A. POSNER
10
     APPEARANCES:
11
     For the Plaintiff:        ROBINS, KAPLAN, MILLER
12                             & CIRESI, L.L.P.
                               BY:  MR. CYRUS A. MORTON
13                                  DR. SHARON E. ROBERG-PEREZ
                                    MR. BRIAN S. CARTER
14                             800 LaSalle Avenue, Suite 2800
                               Minneapolis, Minnesota  55402-2015
15                             (612) 349-8500

16                             ROBINS, KAPLAN, MILLER
                               & CIRESI, L.L.P.
17                             BY:  DR. MATTHEW B. McFARLANE
                               601 Lexington Avenue, Suite 3400
18                             New York, New York  10022-4611
                               (212) 980-7442
19
     For the Defendants:       QUINN, EMANUEL, URQUHART
20                             & SULLIVAN, L.L.P.
                               BY:  MR. BRIAN C. CANNON
21                             555 Twin Dolphin Drive, 5th Floor
                               Redwood Shores, California  94065
22                             (650) 801-5055

23                             QUINN, EMANUEL, URQUHART
                               & SULLIVAN, L.L.P.
24                             BY:  MS. LINDA J. BREWER
                               50 California Street, 22nd Floor
25                             San Francisco, California  94111
                               (415) 875-6403

1     APPEARANCES (Continued):

2
      For the Defendants:          LIFE TECHNOLOGIES
3                                  BY:  MR. COLIN CABRAL
                                   5791 Van Allen Way
4                                  Carlsbad, California  92008
                                   (760) 268-7944
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22
                    COLLEEN M. CONWAY, CSR, RMR, CRR
23                        Official Court Reporter
                   219 South Dearborn Street, Room 2524-A
24                        Chicago, Illinois  60604
                             (312) 435-5594
25                   colleen_conway@ilnd.uscourts.gov

1    (Proceedings heard in open court:)

2         THE COURT:  Good morning, ladies and gentlemen.

3         So, we are here for our summary judgment hearing in

4    the *Promega* case, but we're actually going to start with a

5    *Daubert* hearing for Dr. Ruth.

6         So, Dr. Ruth, do you want to get in a new chair?

7         THE COURT REPORTER:  Sir, would you please raise your

8    right hand?

9    (Witness duly sworn.)

10        THE COURT REPORTER:  Thank you.  Please be seated.

11        THE COURT:  So, Dr. Ruth, we have your report and we

12   have the challenge to you.

13        And, Mr. Cannon, do you want to -- do you have any

14   questions?  Or do you want to summarize briefly or ask Dr. Ruth

15   about your reservations concerning his report?

16        MR. CANNON:  Yes, Your Honor.  Thank you.

17        This is Brian Cannon for Life and Caltech.

18        Dr. Ruth, as part of the briefing in connection with

19   your testimony, I understand that you are no longer relying

20   upon the Smith 1986 paper; is that correct?

21        DR. RUTH:  That's correct.

22        MR. CANNON:  And as part of the briefing, I

23   understand that the primary references -- or, in fact, the only

24   two references that you are relying upon for invalidity are the

25   Ruth '882 patent and the Smith '800 patent; is that correct?

1        DR. RUTH:  There are -- there's other prior art that
2    I relied on.

3        MR. CANNON:  But the primary references are the Smith
4    '800 and the Ruth '882, correct?

5        DR. RUTH:  Yes.

6        MR. CANNON:  And in the briefing that Promega
7    provided in connection with Life and Caltech's challenge to
8    your testimony, Promega stated that you are not relying upon
9    any combination of art but, rather, on the Ruth '882 patent
10   standing alone but combined with the knowledge of those of
11   skill in the art; is that correct?

12       DR. RUTH:  Yeah, to a large extent.

13       MR. CANNON:  And would you admit that on the face of
14   the Ruth '882 patent, it does not contain all of the elements
15   of the claims of the '096 patent?  You have to add in
16   information based upon the knowledge of those of skill in the
17   art, is that correct?

18       DR. RUTH:  That's correct.

19       MR. CANNON:  Your Honor, our motion is based upon
20   partly on the Smith 1986 paper, which Dr. Ruth is no longer
21   relying upon, and on the claim charts that comprise a little
22   over half of the Ruth report.  The 1986 paper is set forth for
23   each of the claims.  So we believe the claim charts in Dr. Ruth
24   's report are no longer relevant to the testimony in this case.
25       And our challenge on legal grounds to obviousness is

1   that there is simply not enough rigor in the analysis of the

2   Smith '800 patent in the report.

3          And, in addition, with respect to the Ruth '882

4   patent, it relies upon --

5          THE COURT:  I tell you, I find your motion to exclude

6   Dr. Ruth's testimony -- I thought it was perfunctory and nasty.

7   You talk about it, you know, you say it's superficial, didn't

8   spend much time on it.  Well, it was a 78-page report.  He's

9   obviously a very distinguished scientist.

10          So I don't understand really what your objection is.

11   Could you put it in one sentence?

12          MR. CANNON:  Yes, Your Honor.

13          It's a 78-page report, but a lot of his report has

14   fallen away because Promega has changed its position.

15          So if you look at the analysis of the Smith '800

16   patent, it's about two or three pages in the report, and it

17   is -- starts on page 29 of the report.  And Promega relies upon

18   that to say that all of the claims are obvious, even though

19   there is no claim chart and there is no -- what I would say

20   rigor in the analysis.

21          And with respect to the other primary reference that

22   remains, which is the Ruth '882 --

23          THE COURT:  You talk about his vague and conclusory

24   opinions.  What is vague and conclusory about his report?  I

25   don't get that.

1           MR. CANNON:  Well, I'm focusing on the portions that
2    remain.

3           THE COURT:  Well, you don't say that.  You talk about
4    his vague and conclusory opinions as if that characterized his
5    entire report.

6           MR. CANNON:  Well, I am focusing now, Your Honor, on
7    the portions that remain.  Because the bulk of the report
8    concerns art that came about after 1984, and now that the
9    priority date is 1984 in this case, that part is no longer
10   relevant.

11          THE COURT:  Uh-huh.  Okay.  Well, thank you, Mr.
12   Cannon.

13          So let me ask you, Doctor, how much of your report do
14   you think is made obsolete by what Mr. Cannon was saying?

15          DR. RUTH:  How much one -- any of the priority -- the
16   priority date later than 1984, of course, goes away, and I
17   don't know how much of the report --

18          THE COURT:  How do you --

19          DR. RUTH:  Off the top of my head, I don't know how
20   much of the report that is.

21          THE COURT:  Well, do you think you should do a new
22   report?

23          DR. RUTH:  I only learned recently that the 1984 date
24   that had been established is the priority date, and so both
25   during my -- formulating my expert report and during my

1    deposition, the priority date was still open.

2              THE COURT:  Uh-huh.  But now --

3              DR. RUTH:  Undetermined.

4              THE COURT:  But, now, part of what you said is no

5    longer relevant?  Is that the agreement, Mr. Cannon?

6              DR. RUTH:  My remarks regarding the -- for example,

7    the Smith *Nature* paper in 1986 have no bearing on a 1984

8    priority date.

9              THE COURT:  So how significant is your discussion of

10   the Smith article to your overall opinion?

11             DR. RUTH:  I didn't hear part of the question.

12             THE COURT:  How much of that Smith article you say is

13   no longer relevant to priority, how much of your report turns

14   on that?

15             DR. RUTH:  Well, a good -- to a large extent, the

16   material that's in the 1986 Smith *Nature* paper is also in the

17   '800 patent.  And so --

18             THE COURT:  So --

19             DR. RUTH:  -- I relied more recently on the '800

20   patent.

21             THE COURT:  Rather than the Smith -- rather than on

22   the Smith article?  Is that what you're saying?

23             DR. RUTH:  I'm having trouble hearing you, sir.

24             THE COURT:  I'm sorry.  You say you are relying more

25   on the '800 patent than on the Smith?

1       DR. RUTH:  As I talk -- as I testify today, that's
2  true.
3       THE COURT:  But there are modifications -- are there
4  modifications you'd want to make in your expert report in light
5  of what Mr. Cannon is saying?
6       DR. RUTH:  Well, the only modification -- one
7  modification would be that I believe that the '800 patent
8  anticipates the '096 patent.
9       THE COURT:  Well, that's not a modification, is it,
10  or --
11       DR. RUTH:  Well, I -- during my deposition, there was
12  some concern from the other side that I hadn't used the word
13  "anticipate" directly.
14       THE COURT:  Uh-huh.
15       DR. RUTH:  So now I'm using the word "anticipate."
16       THE COURT:  Okay.  Let me ask you, so if you were to
17  testify -- of course, you'd be testifying to a jury -- so what
18  would be the key -- the most important point that you'd want to
19  make in your testimony?  And how would you state it in a way
20  that's intelligible to laypeople?
21       DR. RUTH:  Well, in the simplest form, I would say
22  that I was the first one to make fluorescent oligonucleotides;
23  I was the first one to show that they would hybridize
24  specifically; I was the first one to use them in a nucleic acid
25  sequence analysis; and I was also the first one, based on the

1    priority date of the '096 patent, to show extension of a

2    fluorescent oligonucleotide, although that detail is not in the

3    '882 patent.

4              THE COURT:  Now, if you were asked what the '096

5    patent had added, what would you say?

6              DR. RUTH:  I --

7              THE COURT:  I'm sorry.  If you were asked what the

8    '096 patent had added to what was already known through your

9    work and other work, what would you say?

10             DR. RUTH:  Well, I mean, in terms of literally just

11   taking the '882 patent, the addition was the extension by a

12   polymerase.

13             THE COURT:  I am sorry.  I'm not --

14             DR. RUTH:  The addition --

15             THE COURT:  They're not having trouble hearing me.  I

16   don't hear you.

17             DR. RUTH:  Oh.  If you take the '882 patent

18   literally, the limit -- the missing fact that's -- the missing

19   element that shows up in the '096 patent application -- the

20   patent is extension by a polymerase.

21             Now, before December of 1983, I was doing that.

22   Because we had customers that had seen my work and knew what it

23   had application for and had actually collaborated with this on

24   using these to extend -- using these as primers for extension.

25   And so, that work had been done during the 1983 calendar year.

1        THE COURT:  Uh-huh.  So you are really saying the
2    '096 added nothing?
3        DR. RUTH:  I don't believe there's anything new in
4    the '096 patent.
5        THE COURT:  I'm sorry?
6        DR. RUTH:  I don't believe there's anything new in
7    the '096 patent.
8        THE COURT:  Anything new in the '096, right.  Okay.
9    Well, thank you very much, Dr. Ruth.
10        DR. RUTH:  All right.
11      (Witness excused.)
12        THE COURT:  And despite the objections of Life Tech,
13    I think Dr. Ruth is highly qualified to testify, so he will be
14    permitted.
15        So we will move on to another issue.  Yeah, we have
16    this complicated question about -- okay.  We have the '880
17    invention and did -- now -- I don't mean '880.  I mean the
18    '800, the Smith '800 patent.
19        So there are a list of inventors of that patent.
20    Now, were these inventors required to assign subsequent work to
21    Caltech?
22        MR. CANNON:  Yes, Your Honor.
23        Each of the inventors on the '800 patent -- that's
24    Lloyd Smith, Stephen Fung, and Robert Kaiser -- were all
25    Caltech scientists, and they did, in fact, assign the '800

1    patent to Caltech.

2            And Lloyd Smith is also an inventor on the '096

3    patent, which is the patent-in-suit, and he and the other

4    inventors on the '096 patent assigned all of their rights to

5    Caltech.  These are two Caltech-owned patents.

6            THE COURT:  And that's all in the record?

7            MR. CANNON:  Yes.  It's in the file history, the

8    prosecution history of the patents.

9            THE COURT:  Does Promega agree with that?  Any

10   question about that?

11           MR. MORTON:  Well, let me step up, Your Honor.

12           THE COURT:  Mr. Morton?

13           MR. MORTON:  There was a very key thing missing from

14   that last exchange.

15           The Court asked if the inventors were required to

16   assign, and Mr. Cannon simply pointed out that they did assign,

17   and that is a very key distinction in the case.

18           THE COURT:  Okay.  Explain the distinction.

19           MR. MORTON:  Well, we have to look -- it is fairly

20   complicated to step through it, and I'd be happy to do the

21   analysis.  I think the question here is:  Is the '800 prior

22   art?  And the answer is that it is.

23           And the first reason that it is, Your Honor, is that

24   it's by another.  The invented entities are different.  This is

25   well-established patent law.  You can find it also in the MPEP

1    at Section 2136.04, since the inventorship is different, it's

2    by another, so it's prior art.  For anticipation purposes,

3    that's as much as you have to establish.

4            The question has come in for obviousness, if it falls

5    under the safe harbor of 103(c).

6            Here, we have briefed -- and it's in our papers --

7    that we don't think 103(c) applies because of the changes in

8    the law of the patent over time, but I won't get in to that.

9            When we get in to 103(c), there are three ways the

10   safe harbor could apply, if that statute applies at all.

11           The first would be if the patents were owned by the

12   same person, and that hasn't been argued it wasn't true.  The

13   way this went down was the '800 patent, when that application

14   was filed, Lloyd Smith immediately assigned his rights to

15   Caltech.  When the -- what became the '096 was filed, no one

16   had assigned their rights at that point.  The assignments of

17   Lloyd Smith and other inventors come much later.  So there's no

18   ownership by the same person as of 1984 when the '096 is filed.

19           The second way 103(c) can apply -- and this is what

20   we're getting to your question exactly, Your Honor -- I'm sorry

21   it took a while -- is was there -- were the inventors under an

22   obligation to assign to a common owner?  Were they under an

23   obligation or, in the Court's words, were they required?

24           Here, there's no obligation of assignment to Caltech.

25   And, I mean, if we think about this, I mean, what is an

1    obligation?  Generally in the cases, what you would see is an

2    employment contract that would have specific language:  Thou

3    shalt assign any inventions you come up with.

4              THE COURT:  Right.

5              MR. MORTON:  There is no such agreement here, no such

6    contract, no evidence of any actual obligation.

7              And, in fact, there could not be, Your Honor, because

8    the inventors on the '096, at least two of them were not even

9    Caltech employees at the time.  So the Caltech employees had no

10   obligation to assign.  The fact that they later did doesn't

11   show they had an obligation.  The employees of --

12             THE COURT:  Let me just interrupt you, make sure I

13   understand the significance of this.

14             MR. MORTON:  Yes.

15             THE COURT:  So is it correct that if they had this

16   obligation to assign, then that would eliminate an issue of

17   anticipation of '800 for anticipating '096?  Is that --

18             MR. MORTON:  I don't believe so, Your Honor,

19   because --

20             THE COURT:  What is the legal significance of having

21   to assign?

22             MR. MORTON:  This all falls under the 103(c).

23             THE COURT:  I know, so just explain.  What is the

24   significance?

25             Suppose they did have to assign, contrary to what

1    you're saying.  What difference would that make?

2              MR. MORTON:  The difference would be the safe harbor

3    provision would apply and the '800 patent could be used for an

4    obviousness -- could not be used for --

5              THE COURT:  Could not.

6              MR. MORTON:  -- obviousness.

7              THE COURT:  Right.

8              MR. MORTON:  That the --

9              THE COURT:  But it could still be used for

10   anticipation?

11             MR. MORTON:  Correct, Your Honor.

12             THE COURT:  But it couldn't be used for obviousness.

13   Okay.

14             MR. MORTON:  Right.

15             THE COURT:  So -- all right.  That was the second.

16   Is there another provision of 103(c)?

17             MR. MORTON:  Right.  Once we've dealt with no

18   obligation to assign, certainly not by employees of another

19   company --

20             THE COURT:  Right.  No.  I mean, you just said that,

21   yeah.

22             MR. MORTON:  -- we have reached the third way that

23   you can fall under 103(c) under the statute, which is whether

24   there was a joint research agreement between Caltech and

25   Applied Biosystems, and there was not, Your Honor.  And I have

1    a couple of points to make on that.

2            First, the defendants have already pointed out that

3    there was no such agreement.  Earlier in this case -- this was

4    in their Rule 12 brief, docket number 53 -- they specifically

5    said that there's a 1988 agreement, a license agreement between

6    Caltech and Applied Biosystems, and they said that was "the

7    only agreement between ABLLC and Caltech that concerned the

8    patent-in-suit."

9            That's what they've represented earlier.  And now, as

10   we sit here, in this motion, they certainly have not produced a

11   joint research agreement, and 103(c) specifically requires a

12   written contract, grant, or cooperative agreement.

13           Here, there is clearly no written contract, no

14   agreement, and there's none in the record.  And so, that

15   resolves the 103(c) issue, Your Honor.  It does not apply, and

16   the '800 is prior art for anticipation and obviousness.

17           THE COURT:  Okay.  Thank you, Mr. Morton.

18           Mr. Cannon?

19           MR. CANNON:  Thank you, Your Honor.  I'd like to

20   address several of the points that counsel made.

21           As an initial matter, this legal analysis of what's

22   called the 103(c) exception came up in the reply brief, and

23   there was a misstatement of law, and I brought the law with me,

24   about the effective date of this safe harbor provision.

25           There was an indication in one of the footnotes in

1    their reply brief that it does not apply to the '096 patent,

2    and that's fundamentally wrong.

3            I have got the actual Act, and the effective date is

4    2004, all patents issuing after 2004, which the '096 clearly is

5    covered by this 103(c) exception.

6            And I want to just step back and explain that,

7    because what that exception is all about is if you have an

8    entity like Caltech that's doing research and a number of

9    patents come out of that research, the idea is in order to

10   foster collaboration, or even if Caltech was collaborating with

11   an outside entity like Applied Biosystems, the idea is let's

12   foster collaboration and let's not have the entity's patents

13   render each other obvious.

14           The safeguard to prevent multiple patents is the

15   doctrine of obviousness-type double-patenting, which Your Honor

16   raised in an order the other day.  That's separate.

17           Double-patenting, which, by the way, was never raised

18   as a defense in this case until this week, that protects the

19   public from one entity getting multiple patents from the same

20   invention.  The safe harbor provision of 103 encourages

21   multiple patents because entities like Caltech and their

22   collaborators like Applied Biosystems know that they can file

23   for patents and their own patents won't be used against them,

24   under 102(e) and 103, and that's exactly what happened here.

25           All of the patents are assigned to Caltech.  On its

1   face, that shows there was an obligation to assign.  Because,

2   in fact, they were assigned.

3           THE COURT:  Well, wait, wait, that.  That doesn't

4   follow.

5           MR. CANNON:  All of the --

6           THE COURT:  The fact of assignment doesn't establish

7   an obligation to assign.

8           MR. CANNON:  But these patents are owned by Caltech.

9   As a preliminary matter, the assignee of record is Caltech.  So

10  to get to the second level of the analysis, if there's multiple

11  entities owning it, then you might look at it.

12          THE COURT:  But usually, in my limited experience,

13  the obligation -- the way in which faculty members' patenting

14  or outside research or what have you is regulated by the

15  universities in the employment contract.  It says, you know, if

16  you use any university facilities in inventing, then the patent

17  is owned by the university, and you get 30% of the royalties

18  and we get 70%.

19          Is there any provision of that sort in the employment

20  contract?

21          MR. CANNON:  You know, there's some employment

22  contracts, but there's also Caltech's IP policy handbook which

23  provides that Caltech owns the patents, but the inventors get a

24  share.  I think they split 30% of any royalties, however many

25  inventors there are.  And so, I believe that's of record.

1        I mean, one problem that we have on this motion, Your

2   Honor, is that the Smith '800 patent really only came into

3   focus as a defense in this case, as a primary defense about a

4   couple of weeks ago.  It's listed in a laundry list in, you

5   know, a lot of other patents, but the way this case is narrowed

6   down, it only became kind of an important reference very, very

7   recently.  And so, the fact of the matter is this issue -- some

8   of these issues came up on reply in the summary judgment

9   briefing.

10       THE COURT:  But is your contention that this policy

11  handbook is the equivalent of a commitment, equivalent of an

12  employment contract or other contract?

13       MR. CANNON:  That's correct, Your Honor.  And also

14  there's California law layered on top of that, California labor

15  law about who owns inventions that come out of someone's

16  workplace.  And we haven't briefed this issue because it really

17  didn't come up until just very recently.  But California law

18  provides that employers own, you know, what goes on in the

19  place of employment using, you know, any employee's

20  equipment -- employer's equipment and things like that.

21       So it's our position that under that exception, that

22  this is two Caltech patents, they cannot be used against each

23  other for regular obviousness-type analysis, or one or two

24  analysis.

25       Obviousness-type double-patenting is available when

1    you have the same entity with two patents and the law wants to

2    prevent two patents on the exact same thing, but that is brand

3    new and that was -- we believe that position has been waived by

4    Promega because that was not part of their contentions and was

5    not part of their expert reports.  They filed a brief on it

6    last night.  That's the first we've seen of this contention.

7            THE COURT:  Uh-huh.  Okay.  Thank you, Mr. Cannon.

8            Mr. Morton, do you want to respond to that?

9            MR. MORTON:  I guess just briefly, Your Honor.

10           Nothing Mr. Cannon said changes the fact that there

11   is not a written joint research agreement between Caltech and

12   Applied Biosystems, and there's no way to get over that.

13           THE COURT:  Why isn't that policy handbook he

14   mentioned adequate?

15           MR. MORTON:  The policy handbook that was mentioned,

16   to my knowledge, has not been produced, and it certainly does

17   not apply to the employees of Applied Biosystems who, in fact,

18   later -- I mean, this all happened later.  And there was a

19   dispute about whether Charles Konig should be on the patent as

20   an inventor, and it played out in the file history.

21           And I could go into that in greater detail, but I

22   don't think it's necessary.  These were -- this is a separate

23   entity, separate inventors.  No handbook and no California law

24   can say that they were obligated to assign to Caltech or that

25   they were operating under a joint research agreement which did

1    not exist.

2          THE COURT:  Well, if the policy handbook says that

3    all the patents developed by, you know, faculty using

4    university facilities are owned by Caltech, well, that would be

5    the equivalent of required assignment.

6          MR. MORTON:  Not -- certainly not for the Applied

7    Biosystems inventors who they -- there was a whole separate

8    dispute about this.

9          THE COURT:  No, I understand.  That's a new point you

10   just made about Applied Biosystems.

11         MR. MORTON:  Yeah.  So you're saying --

12         THE COURT:  So you're saying --

13         MR. MORTON:  -- if there was, in fact, a policy

14   handbook for Caltech employees, would that obligate them to

15   assign?  I think that's a question we should open the books and

16   research a little further.  I think it has to be more explicit

17   than that.  I think you have to have an actual --

18         THE COURT:  Why?  I don't understand.

19         MR. MORTON:  Because there's such a strong policy and

20   strong law in the United States that inventors own their

21   inventions.  And it happens all the time, so --

22         THE COURT:  Yeah, but, as Mr. Cannon pointed out, it

23   certainly made -- this principle about -- where this goal of

24   encouraging collaboration by not having the patents developed

25   by the same faculty people, you know, knock each other out,

1    that's perfectly sensible.  And why would you want to be so

2    picky about the contractual obligation.

3          Policy handbooks are usually treated -- employment

4    handbooks as opposed to employment contracts, they're usually

5    treated as the equivalent of the employment contract.  You

6    know, the employer is telling you:  These are the rules, you

7    know.  This is the deal.  So why isn't that -- I mean,

8    obviously, it has to be in the record, but I don't see why the

9    fact that it's a policy handbook rather than an actual contract

10   or formal contract should make a difference.

11         MR. MORTON:  Your Honor, it's hard for me to answer

12   the question without seeing the handbook.  And, you know, I

13   understand, I understand Your Honor's point.

14         THE COURT:  Okay.  Well, let's talk a little bit

15   about the double-patenting, the double-patenting doctrine --

16         MR. MORTON:  Yes, Your Honor.

17         THE COURT:  -- which is new to me.  And Mr. Cannon

18   says, well, you've just pulled this rabbit out of your hat,

19   that they had no warning and --

20         MR. MORTON:  Sure.  Should I address that, that issue

21   first?  Because --

22         THE COURT:  Yes.  Why don't you --

23         MR. MORTON:  -- the argument that there's --

24         THE COURT:  -- talk about that.

25         MR. MORTON:  -- a waiver --

1          THE COURT:  Go ahead.

2          MR. MORTON:  So I think it's important to go through

3     just a little bit of history, Your Honor, to understand that.

4          THE COURT:  Okay.

5          MR. MORTON:  And we set this forth in our brief last

6     night.  And I'll just talk you through it, and it won't take

7     that long.

8          But, basically, these patents, these inventions, they

9     were two different things.  One was a linkage between an oligo

10    and something else, like a fluorophore, and one had to do with

11    a new way to do Sanger sequencing.  And they progressed in the

12    Patent Office in different chains of applications.

13         And my client was sued on the sequencing side of

14    these applications -- in one, of course, these are not

15    sequencing -- and had it in mind that that was what these

16    patents were about.  And in the reissue, what had happened was

17    the defendants continued to distinguish the prior art, saying,

18    well, that prior art wouldn't be suitable for sequencing,

19    including our Claim 62, which we all know now doesn't say

20    sequencing in it.

21         That's how this went through the file history, even

22    in the reissue, Your Honor.  So when it came out, it was

23    difficult for anybody to understand that we're no longer

24    looking at a sequencing patent; even though some of the claims

25    said sequencing, some didn't, that there's now an attempt in

1    this reissue to get back to the chemistry side of the two

2    chains of applications.  So --

3          THE COURT:  Wait.  I am losing this.  Are you talking

4    about the '800 patent?

5          MR. MORTON:  Yes.  So the '800 patent and that side

6    of applications is all about the chemistry of coupling --

7          THE COURT:  Right.

8          MR. MORTON:  -- from an oligo to a fluorophore.  All

9    right?  And the other side of the applications is about various

10   aspects of using this in sequencing.

11         THE COURT:  Right.

12         MR. MORTON:  So the honest situation here, Your

13   Honor, is when we did our validity contentions -- that was

14   about a year ago -- all of the claims were still in the case,

15   including the sequencing claims.  We thought this was a

16   sequencing patent.  We got into the expert reports and set

17   forth, based on the '800 patent, that it should be invalid.

18         This idea that there's no idea about the '800

19   patent -- it was a very long chart -- I can go through our

20   validity contentions -- very clearly say anticipation of '800

21   patent, lay out everything in the '800 patent.  It wasn't

22   until --

23         THE COURT:  No, I understand the argument that the

24   '800 patent --

25         MR. MORTON:  Yes.

1          THE COURT:  -- is -- not only that the '096 -- that

2    after the '800 patent, what was added by the '096 was

3    peripheral or obvious or --

4          MR. MORTON:  Sure.

5          THE COURT:  That I understand.

6          MR. MORTON:  Right.  And I am --

7          THE COURT:  But the double-patenting doctrine, that's

8    not just a simple obviousness point, really.

9          MR. MORTON:  No.  And I am getting to that, Your

10   Honor.

11         THE COURT:  Okay.

12         MR. MORTON:  So the first time that it kind of became

13   clear, I think, to my client, to us, what we were up against

14   was in the *Markman* briefing, we start to see this is a patent

15   that's only about the chemistry and not about sequencing, and

16   we got Your Honor's order that says that this is now basically

17   a chemistry patent.  And it's really at that point that the

18   obviousness-type double-patenting really comes up strong as a

19   possible issue.

20         And so, you know, what we have here today, what I

21   would say to the Court is we have a different legal theory

22   based on the same operative facts, that is, a theory that

23   arises in equity.

24         THE COURT:  Okay.  So, explain the double-patent

25   because I have never encountered it before, so -- never heard

1    of it.

2              MR. MORTON:  Sure, Your Honor.

3              The entire -- the purpose, if we back up for a

4    second, behind obviousness-type double-patenting is to prevent,

5    to prevent an applicant from extending their monopoly longer

6    than they should be allowed to.  So if they've already gotten

7    claims -- normally what happens in the file history is if you

8    want to get additional claims that are really obvious in light

9    of your first claims, the Patent Office requires a terminal

10   disclaimer.  So that the patent terminal --

11             THE COURT:  Requires a what?

12             MR. MORTON:  A terminal disclaimer.

13             THE COURT:  Terminal disclaimer.

14             MR. MORTON:  Yes.  And so, that is something that is

15   usually required.  And if you file that, what happens is you

16   can still get your obvious variant claims issued, but there's a

17   cutoff on the patent term so that it won't go beyond what it

18   should.

19             THE COURT:  Which you say is 2009?

20             MR. MORTON:  Right, right, which is already a pretty

21   good run, Your Honor, for something that started in 1983.

22             But yes.  Under the old rules of 17 years from

23   issuance, which, of course, Congress decided this was all a

24   problem and changed it to 20 years from filing, but under the

25   old rules, 17 years from issuance, yes, should be expired in

1    2009.

2           THE COURT:  So that's the argument?

3           MR. MORTON:  Well, that's basically double-patenting.

4           THE COURT:  Right.

5           MR. MORTON:  I would like to go, if I could, a little

6    more deeply into our argument --

7           THE COURT:  Okay.

8           MR. MORTON:  -- as we briefed it last night, and

9    hopefully simplify it down.  It is pretty simple, ultimately,

10   Your Honor.

11          The issue is, if we go back to this technology,

12   clearly oligonucleotides are known and, actually, fluorophores

13   were known -- we put in that their expert said it had been

14   known since the '40s -- and known how to attach them to a mean

15   group since the '40s.  The issue here was the linkage.

16          THE COURT:  Right.

17          MR. MORTON:  Right?  It's just the chemistry.  And

18   once you have that linkage, then you can attach it.

19          And we've talked around about this being like we know

20   we have a truck and we know we have a trailer and a boat, and

21   we just have to come up with a hitch.

22          That's what Jerry Ruth, Dr. Ruth did first and then

23   what Dr. Smith did in a slightly different way for the '800

24   patent.  Right?

25          And in the '800 patent, what he claimed -- and it's

1    set forth in the briefing -- is the hitch.  And it's that mean,

2    it's claimed exactly what he actually invented, frankly.  And

3    that was the basis of the invention.

4            From there, the main thing to understand is that you

5    are not supposed to then be able to extend your monopoly by

6    claiming obvious uses of your actual invention.

7            And what they've done -- I would point the Court to

8    Exhibit 6 of our submission last night -- the other patent in

9    that same chain claims the linkage, plus fluorophores, and

10   lists ten different fluorophores.

11           So that claim, Claim 1 of the '802 patent, Exhibit 6,

12   is in the record.

13           They've got their monopoly on that.  They got to

14   enjoy it.  Then what's happened is -- and was Congress'

15   surprise -- I think maybe to the Patent Office, certainly to

16   us -- they're now trying to claim even further use and saying:

17   Well, okay.  Now that we have the linkage and we've -- now we

18   say we've added the fluorophore, let's also claim that it's

19   extendable by a polymerase, which is the obvious use, the whole

20   point of doing this back in the '80s, was to use it and saying

21   it's sequencing, which everyone knows is -- you've used it and

22   it's extendable by a polymerase.

23           So that's what's happened here.  And if I could

24   address a point of law on that, Your Honor.

25           I think both parties have cited to the *Eli Lilly* case

1    to say that when you perform this analysis, you just look at

2    the claims of the '800 patent, compare it to the claims now in

3    the '096 patent, and all you can look to the specification to

4    is for the construction of the claims.

5              THE COURT:  To what?  I am sorry.

6              MR. MORTON:  For the construction of the claims --

7              THE COURT:  Okay.

8              MR. MORTON:  -- you need to do that.

9              The important exception to that, which is noted in

10   the *Eli Lilly* case -- and it cites back to a case called *In Re:*

11   *Byck*, which is 48 F.2d 665, CCPA 1931.  That case sets forth

12   this exact issue, where someone has claimed their basic concept

13   and are now trying to extend their patent monopoly by claiming

14   uses of it.  And that case says:  "It would shock one's sense

15   of justice if an inventor could receive a patent upon a

16   composition of matter, setting out at that length in the

17   specification the useful purposes of such composition,

18   manufacture and sell it to the public, and then prevent the

19   public from making any beneficial use of such product by

20   securing patents upon each of the uses to which it may be

21   adapted."

22             The point of this, the point of that exception is

23   that you actually can look to the specification to see if

24   there's uses for the composition of matter and if what the

25   applicant is now doing is continuing to extend that monopoly by

1    claiming those uses.  And, here, in the '800 patent, it clearly
2    says use it for Sanger sequencing, and we all know what that
3    means.
4              THE COURT:  Okay.  I think I understand your
5    argument, but I don't understand what the double-patenting
6    doctrine adds to simple obviousness.  Because what you're
7    saying is that the '800 patent, although it didn't discuss
8    uses, was obviously designed to enable, you know, the use,
9    which later appears in the '096.  And so, the use is obvious.
10             So, what do you need a double-patenting doctrine for?
11   What does it add to obviousness?
12             MR. MORTON:  Your Honor, I think the analysis is very
13   simple -- very similar, and I think that the Court can come to
14   the conclusion either way.  If you look at the '800 patent for
15   straight obviousness, which I think applies, I -- that's a --
16   the content of the '800 is not in dispute, any differences are
17   not in dispute, and the conclusion of obviousness is a question
18   of law for the Court.  I think we've set forth why that should
19   be pretty clearly.
20             And the response on that point on obviousness over
21   the '800, I mean, there really is no response.  The
22   obviousness-type double-patenting just adds an additional legal
23   theory, resolves in equity, that basically follows the same
24   kind of analysis to get to the same result.
25             THE COURT:  Now, do you draw any distinction in the

1    way you analyze between Claims 62, 66, and 67?

2         MR. MORTON:  Those claims are certainly worded

3    differently, so there is, you know, at least theoretically, a

4    slightly different analysis under each one.  I am happy to go

5    through those.

6         THE COURT:  No.  That's okay.

7         MR. MORTON:  Okay.

8         THE COURT:  Okay.  Well, thank you.  I will hear from

9    Mr. Cannon now.  Thank you, Mr. Morton.

10        MR. CANNON:  Thank you, Your Honor.

11        Your Honor, obviousness-type double-patenting is a

12   new and different legal theory, and it has been waived.

13        Counsel had a very long lead-up to the admission that

14   it was a brand-new defense in this case.  But the simple fact

15   is, even after Your Honor's claim construction order, if you

16   recall, Promega made a motion to supplement it.

17        THE COURT:  But what does double-patenting

18   obviousness add to simple obviousness?

19        MR. CANNON:  Because, Your Honor, it's different.  It

20   applies when you have an -- one entity that may be seeking to

21   patent the same thing in different patents.

22        THE COURT:  Right.

23        MR. CANNON:  Because in obviousness-type

24   double-patenting, what you look at is the claims.  That's the

25   key difference.  It's a claim-to-claim comparison.

1          So, what you do is you take the claims of the '800

2     patent and construe them, which we have not done because this

3     is a new defense, you construe the claims of the '800 patent

4     and you compare them to the claims of the '096 patent as

5     construed.  If it's the same invention, then obviousness-type

6     double-patenting applies because the policy -- and, by the way,

7     this is a judicially --

8          THE COURT:  But if it's the same invention --

9          MR. CANNON:  It's the same invention or obvious

10    variance of it.

11         THE COURT:  Yes.  But obvious variance would surely

12    come within the obviousness doctrine.

13         MR. CANNON:  I think it's different, Your Honor.

14    Because if you look at a claim, what is an obvious variant of

15    that claim?  You don't get to just open up the world as if --

16    like because in regular obviousness analysis, you look at the

17    entire scope of the prior art.  You say:  What would a person

18    of ordinary skill, hypothetically, with all the art in their

19    head, what would they consider the invention obvious?

20         Obviousness-type double-patenting -- and if you look

21    at the *Hubbell* case that Your Honor cited in the order, the

22    order that prompted the briefing from last night, there, there

23    was no dispute that the invention was literally the same.  If

24    you practice one invention, you infringe the other, and

25    vice-versa.

1          Our case is very different.  You can practice the

2    '096 patent.  You can infringe it --

3          THE COURT:  Yes, no, but --

4          MR. CANNON:  -- and not infringe the --

5          THE COURT:  -- in the example you give, if it's

6    obvious, it's -- I don't -- what would be a case where you'd

7    have double-patenting obviousness but not have ordinary

8    obviousness?

9          MR. CANNON:  I think ordinary obviousness allows a

10   little more leeway to say one of skill in the art could create

11   the invention, could combine things.  If there was a motivation

12   in the art, if there was something explicit, if there was a

13   scientific paper that suggested combining the elements a

14   certain way, you could look at that in the art for regular

15   obviousness and combine them.

16         THE COURT:  But this double-patenting obviousness is

17   obviously -- obviously -- it's a more forgiving doctrine.  It

18   shortens the patent term.  It doesn't eliminate --

19         MR. CANNON:  That's correct.

20         THE COURT:  -- patentability.

21         MR. CANNON:  Because it --

22         THE COURT:  And why is that?  What is it about the

23   double-patenting obviousness concept that justifies a more

24   forgiving --

25         MR. CANNON:  Because if it --

1      THE COURT:  -- added --

2      MR. CANNON:  I'm sorry.

3      THE COURT:  Yeah, go ahead.

4      MR. CANNON:  The idea is if you have one entity, the

5  entity is allowed -- like Caltech, for instance, in this

6  case -- it's allowed to have patents on the same invention.

7  And if, for whatever reason, it has multiple patents on the

8  same invention --

9      THE COURT:  So this is actually related to the

10  earlier discussion?

11      MR. CANNON:  That's right.

12      THE COURT:  That's right.

13      MR. CANNON:  So double-patenting, that's the -- how

14  to -- that's almost a safeguard to offset the fact that if you

15  have an entity with multiple patents, one entity's patents

16  shouldn't be used against it, except double-patenting prevents

17  an entity from having multiple patents on the same invention.

18      And, Your Honor, we put in a declaration last night

19  from an expert, Carl Batt, who went through the claims and

20  explained, from a technical perspective, why they're different.

21      And it's interesting that -- Promega's counsel made a

22  lot of arguments about the chemistry involved -- comparing the

23  Smith claims and the '096 patent claims, but you have to

24  actually dig down into the chemistry.  You can see it's quite

25  different.  And the Smith '800 patent is an intermediate

1    compound that could be modified and, in fact, through

2    subsequent work was modified and was used in genetic analyses,

3    and that's the invention of the '096 patent.  It's a separate

4    chemical invention.  It's an intermediate compound.

5            And we have set forth -- we have a table in our brief

6    from last night showing the differences between the claims.

7            And obviousness, Your Honor, it's -- what goes

8    through Promega's briefs is really a lot of hindsight, and the

9    law of obviousness really is intended to put a check on

10    hindsight, because today everything looks obvious in light of

11    the patent.

12            THE COURT:  No, no, I agree.  Hindsight is a serious

13    problem with obviousness, you know.

14            MR. CANNON:  And so, there's a danger in these cases,

15    Your Honor, of having obviousness just take over everything.

16    And there really needs to be a rigor with obviousness because

17    you can't just say today:  Well, of course it was obvious,

18    because the inventors in this case proved that it worked.  They

19    proved if you could put the fluorescent label on a particular

20    spot on the oligo that you could extend it.  You could use

21    multiple fluorescent oligos, and you could derive sequence

22    information about DNA using those compounds.

23            And, of course, today that seems great, because

24    everybody uses it, but -- so it seems obvious, but you really

25    have to go back in time and prevent hindsight.  Otherwise,

1  every patent looks obvious.  It really takes an invention --
2  even if something was in the prior art, to combine it in a
3  certain way and prove that it works, that's an invention.

4  And I think the danger with Promega's approach is it
5  really relies on hindsight.  It really has no rigor in terms of
6  saying:  Here is why it was easy to modify.  Here's why
7  everyone knew it would work.  It's easy to say:  Well, of
8  course it would work, because the inventors proved it worked,
9  and that's very different than saying:  Well, every one of
10  skill, you know, knew it would work.  That's absolutely not
11  true.  And I think the success of the invention, of the '096
12  patent, is testament to the inventive quality of what happened
13  in '84.

14  So, in sum, Your Honor, obviousness-type
15  double-patenting is a different legal doctrine, and it has been
16  waived.  Because until Your Honor's order, we hadn't heard a
17  peep about obviousness-type double-patenting until last night's
18  brief.

19  THE COURT:  Does the double-patenting, does it do
20  more than qualify the collaboration doctrine that you were
21  discussing earlier?

22  MR. CANNON:  Well, I think that's -- that's the
23  policy behind it, is that -- because it often happens that the
24  patent -- the Patent Office will look for this in patents.
25  And, in fact, the '800 patent was cited during the prosecution

1   of the '096 patent, and the examiner allowed the claims.

2           And so, you know, in the case law, you often see it

3   come up from the Patent Office.  And the *In Re:  Byck* case that

4   Your Honor cited the other day was an example of that, where

5   the Patent Office said:  No.  This looks to be the same

6   invention that you're claiming in another application.  And so,

7   there was a double-patenting rejection at the Patent Office.

8           But I think the policy is how I described it, which

9   is if you have separate entities, then regular obviousness --

10          THE COURT:  Right.

11          MR. CANNON:  -- applies.  But if you have the same

12  entity, usually obviousness doesn't apply.  Right?  Because you

13  want someone, a company, like an entity like Caltech --

14          THE COURT:  But I guess what's puzzling about it is

15  it sounds as if the patentee would be -- well, maybe not in

16  this case because of just how the dates work out.  But usually

17  you think the patentee would be preferring the double-patenting

18  obviousness doctrine.

19          MR. CANNON:  Well, the patentee usually wants, you

20  know, different claims for different inventions, and that's

21  what happened here.

22          And, you know, counsel raised equity in fairness, but

23  the equity in fairness here is Caltech's '096 patent, language

24  to the Patent Office, through no fault of its own.  And when it

25  finally issued, now when it comes time to pay, Promega doesn't

1    want to pay, and so it says:  Oh, it should have expired a long
2    time ago.
3         Well, the Patent Office issued it, and now it's a
4    valid patent for a number of more years, and Promega ought to,
5    you know, ought to pay up now that the patent has been issued
6    by the Patent Office.  But --
7         THE COURT:  Okay.  So you're saying -- so this is, in
8    effect, a backup for Promega.  If it can invalidate the patent,
9    that's okay, if it can cut its term down.
10        MR. CANNON:  That's right.  And, in fact, the term
11   that Promega wants is Promega wants this patent to have expired
12   in '09 so that it would have -- so our client will get no
13   royalties whatsoever.
14        THE COURT:  Right.  Okay.  Thank you, Mr. Cannon.
15        Well, let's talk a little about the -- actually what
16   Mr. Cannon was starting to talk about, which is the basic
17   obviousness doctrine.  Given the '800, was it obvious, was the
18   use obvious.
19        So, the way Life Tech has presented this, the '800 is
20   just chemistry and it doesn't tell you, you know, how you
21   actually use the chemistry to, you know, make use of DNA for
22   various purposes.  And that's what the '096 does.  But, of
23   course, Promega is arguing that really the chemistry of this
24   '800 patent, that just makes it completely obvious how to use
25   it.  Right?

1        So, do you want to say a word about that, Mr. Cannon?

2    Because that's obviously, you know, critical to the case.

3        MR. CANNON:  Yes, Your Honor.  And I think this

4    really -- the way Your Honor described it really hammers home

5    the hindsight bias that's at work here.

6        And I was thinking about it this morning, and I think

7    Promega's argument has essentially three levels of hindsight.

8    They take intermediate compounds which are developed in '83 and

9    they have to say:  Well, everyone knew to modify the oligo,

10   one, and that everyone knew that you could use it in a certain

11   way to derive genetic sequences; and three, it was so easy that

12   everyone knew it would work right away.

13       Well, that's three levels of hindsight going back in

14   time.  You have to modify the chemistry, you have to use it or

15   have the idea to use it for genetic sequencing or sequence

16   analysis, and you have to make it work.  And none of that is in

17   the prior art.

18       So the obviousness case requires three different

19   leaps and, Your Honor, it's three leaps too far, because

20   hindsight, the hindsight analysis just makes everything look

21   obvious, but it takes modifying the chemistry, using it a

22   certain way, and actually being successful, all of which the

23   '096 patent inventors did and none of which is present in the

24   prior art.

25       THE COURT:  Uh-huh.  Mr. Morton, do you want to

1    respond?

2            MR. MORTON:  Yes, Your Honor.

3            As you might expect, I don't think that any hindsight

4    is required to get there based on the '800 patent.  As we've

5    all discussed, clearly admitted that it shows the linkage, how

6    you attach things to an oligonucleotide.  In addition, it tells

7    you what to attach.  It provides at least ten different

8    fluorophores that you can attach using the linkage invented by

9    Dr. Smith.  So there's no leap of logic from the compounds to

10   the modifications.  It's directly in there, at least ten

11   fluorophores, admitted by Dr. Smith in his depo, which is in

12   our brief.

13           And the final leap that Mr. Cannon refers to is:

14   Well, how would you use it?  How would you ever know what to do

15   with it?  And it says expressly -- and we've cited this

16   repeatedly -- in the '800 patent:  "The materials prepared in

17   this fashion" -- the fluorescently-tagged oligonucleotides --

18   "are effective in DNA hybridization methods as illustrated by

19   their use as primers in DNA sequence analysis."

20           There is no leap, no step that's not there.  DNA

21   sequence analysis with primers is sequencing that was known in

22   the '70s.  That was the whole point of Dr. Smith's work, it was

23   the point of Dr. Ruth's work, was to replace radioactivity with

24   florescence.  They both talk a way to do that and how to do the

25   linkage.  And the '800 patent clearly says that it's effective

1   for hybridization and DNA sequence analysis.  So there is no
2   leap whatsoever.
3           THE COURT:  When was the '800 patent published?
4           MR. MORTON:  That's a good question, Your Honor.  I'd
5   have to take a look at that.
6           THE COURT:  See, I'm just wondering, the more obvious
7   the '800 patent was, presumably the quicker the industry would
8   react.  That's why I am interested in the lapse of time between
9   when the '800 was published and when, you know, development or
10  discussion or someone --
11          MR. MORTON:  Sure.
12          THE COURT:  -- said:  You know, now we know how to do
13  this.
14          MR. MORTON:  Right.
15          THE COURT:  That would be the best, right?  If
16  that --
17          MR. MORTON:  Right.
18          THE COURT:  If a week after the '800 is published,
19  the industry, with great excitement, says:  Okay.  Now we know
20  what to do.
21          MR. MORTON:  Right.  A couple of points on that.
22          I mean, I do think I know the answer.  You may not
23  want to quote me.  But I think the primary disclosure
24  everyone's talked about is the 1986 Smith paper.  That's when
25  they really come out with this.  After they've done a bunch

1    more work and added to what they did, they came up with the

2    Smith paper.

3            In general, back in this time, patents didn't publish

4    the way they do now.  Now, after 18 months, there's usually

5    publishing.

6            THE COURT:  Right.

7            MR. MORTON:  Back then, it was usually secret until

8    it issued.

9            THE COURT:  I see.

10           MR. MORTON:  I do know --

11           THE COURT:  There's no publication until issuance.

12           MR. MORTON:  Right.  And I do know the '800 patent

13   issued in 1992, Your Honor.

14           To address your other concern, I think I would simply

15   point back to the statute, 102(e), which has been the law for a

16   long time, as far as what constitutes prior art, and a prior

17   filing is prior art, period.

18           And I did have one more point that I wanted to add --

19           THE COURT:  Sure.

20           MR. MORTON:  -- on the obviousness case, Your Honor;

21   that as you look through the briefing and look to the report of

22   Dr. Dovichi, there really is no substantive argument that the

23   '800 patent does not render any of the claims obvious.  The

24   only argument that's been put forward that I'm aware of, and

25   it's put forward by Dr. Dovichi, is that it's not enabled for

1    sequencing.  That was the argument before.

2              THE COURT:  That's a separate issue, yeah.

3              MR. MORTON:  Well, it's the issue -- it's the only

4    response on the '800 patent, as far as any difference between

5    the '800 patent and the claims that's put forth by their

6    expert, is that it was not enabled for sequencing, and, of

7    course, it was.  It says to do that, and it, in fact, worked.

8              But the point that I wanted to make for the Court, in

9    case that came back up as an issue, is I wanted to cite the

10   *Amgen* case.  It's 314 F.3d 1313.  It's a Federal Circuit case

11   from 2003.  And in *Amgen*, the District Court had ruled a patent

12   was valid, noting that the prior art would have been good prior

13   art if it had been enabled, and the Federal Circuit vacated

14   that decision of the District Court and noted that under

15   Section 103:  However, a reference need not be enabled.  It

16   qualifies as prior art regardless of whatever is disclosed

17   therein.  Therefore, the Court's obviousness holdings with

18   respect to prior art reference should not be -- concern

19   themselves with whether or not it's enabled.  And it was

20   vacated and returned to the District Court because that's not a

21   basis.

22             Basically, a prior art document says what it says and

23   teaches what it teaches to a person of ordinary skill in the

24   art, and the '800 patent teaches how to modify

25   oligonucleotides, attach fluorophores, and says it will be

1    effective for hybridization and use in DNA sequence analysis.

2              THE COURT:  Okay.  Thank you.  Thank you, Mr. Morton.

3    Mr. Cannon?

4              MR. CANNON:  Your Honor, can I just reply?  Thank

5    you.

6              THE COURT:  Sure.

7              MR. CANNON:  Something very curious in what counsel

8    argued in referring to the '800 Smith patent.  And I know Your

9    Honor has a copy -- there's a lot of paper -- but I think it's

10   important to have a look at it.

11             Because, if you recall, the Smith '800 patent was

12   filed one month before the '096 patent.  They were essentially

13   co-pending.  Caltech filed them within a month of each other.

14             And counsel pointed to a section of the '800 patent

15   where counsel said that the Smith patent says that this could

16   be used for sequencing-type analysis, such as specific

17   hybridization.  However, if you look at the Smith '800 patent

18   -- it's in column 3, beginning at line around 58 -- it

19   references --

20             THE COURT:  Wait.  Hold on.  Let me take a look.

21             MR. CANNON:  Sure.

22             THE COURT:  You said at line 58?

23             MR. CANNON:  Right.  So if you look at the Smith '800

24   patent, column 3, the top half of the page has a number of

25   chemical formulae; and then down below, there's a paragraph

1    that begins:  "There are many reasons to want" --

2            THE COURT:  Wait.  I think I am looking at the wrong

3    one.  So I am looking at the Smith patent on --

4            MR. CANNON:  Smith '800 --

5            THE COURT:  -- column 14 --

6            MR. CANNON:  Column 3, Your Honor.

7            THE COURT:  Oh.  Because there's a 58 on --

8            MR. CANNON:  Okay.

9            THE COURT:  Okay.  Let me find that.

10           MR. CANNON:  So it's really on the fourth page of the

11   document, on the '800 patent.

12           THE COURT REPORTER:  Do you have a copy for the

13   Court?

14           MR. CANNON:  You know, I do not.

15           THE COURT:  Okay.  I am looking at column 3.

16           MR. CANNON:  And there's a paragraph that begins:

17   "There are many reasons to want a method for covalently

18   attaching" --

19           THE COURT:  No, that's not on column 3.  What page is

20   it on?

21           MR. CANNON:  So it's the '800 patent, not the '096

22   patent.  There's a chance you have the '096 patent.

23           THE COURT:  Oh, I am looking at the wrong one.  Yeah.

24   No.  Okay, okay.  Let me try again.

25           MR. CANNON:  Thank you.

1           THE COURT:  Okay.  Column?

2           MR. CANNON:  Column 3.  So there should be a number

3    of chemical formulae at the top of the page.

4           THE COURT:  "There are many reasons," right.  Okay.

5    Fine.

6           MR. CANNON:  Yes.  And then you go down and it says:

7    "There are many reasons."

8           THE COURT:  Right.

9           MR. CANNON:  And that's the paragraph I want to point

10   to.

11          THE COURT:  Okay.

12          MR. CANNON:  And so, counsel pointed to this

13   paragraph, I believe, to say:  Hey, look, the Smith '800 patent

14   renders the '096 patent obvious because it suggests using it,

15   using this intermediate chemical compound for genetic analyses.

16          But if you look, what's being referred to here is a

17   co-pending application, 570,973, filed January 16th --

18          THE COURT:  Right.

19          MR. CANNON:  -- 1984.  That is the '096 patent.

20          THE COURT:  Right.

21          MR. CANNON:  So the Smith patent, a Caltech patent,

22   is co-pending with the Caltech '096 patent, and Smith says:

23   Hey, take a look at the '096 patent, which sort of underscores

24   my point about an entity having multiple applications, knowing

25   they can do that, because their own applications won't be used

1    against them, although Promega is now trying to use its own

2    applications against them.

3           And it's -- in essence, what Promega is doing is

4    using the '096 patent against itself, saying:  The '096 patent

5    application is referenced in the '800 patent; therefore, the

6    '096 patent is obvious.  And, Your Honor, you really can't use

7    a patent to render itself obvious.

8           What Promega should have done is gone in with

9    obviousness-type double-patenting early in the case, if that's

10   what they wanted to go for, because it's the same entity.  One

11   entity's patents shouldn't be used against it in regular

12   obviousness analysis for exactly this reason, because entities

13   are allowed to cross-reference their own pending applications.

14          THE COURT:  Well, what about -- I'm looking at the

15   next -- at column 5 on the next page, where it says:  "The

16   materials" -- this is the last full paragraph, column 5.  It

17   says:  "The materials prepared in this fashion are effective in

18   DNA hybridization methods as illustrated by their use as

19   primers in DNA sequence analysis."

20          Now, are you saying this is also a kind of

21   cross-reference --

22          MR. CANNON:  It --

23          THE COURT:  -- of the '096?

24          MR. CANNON:  This doesn't specifically reference it,

25   but it's essentially a cross-reference.  And it doesn't

1    reference exactly how to do this.  It says they could be
2    useful.  But you have to look at the '096 patent to learn how
3    to use them.
4         THE COURT:  Well, what would be an example of
5    something in the '096 which tells you how to use it and, you
6    know, really is indispensable?
7         MR. CANNON:  Well, Your Honor, first, there's at
8    least four fluorescents -- four different oligonucleotides in
9    the '096 patent with different fluorescent tags.  Secondly,
10   there's an example of actually generating sequence information
11   by using the oligonucleotides.  Remember, no one had done this
12   until now.
13        So it's easy to say it's obvious and it would have
14   worked.  That's because it did actually work, and it took the
15   inventors of the '096 patent to show the world:  Hey, look, it
16   worked.  And so, there's actual examples of sequence analyses
17   in the '096 patent, including being able to extend the labeled
18   oligonucleotide by a polymerase.
19        Promega likes to say that's obvious, but until
20   someone actually did it in the '096 patent, it's not obvious.
21   No one actually knew it would work until they actually did it.
22        Even if the '800 patent makes suggestions:  Hey, this
23   could be useful in certain applications, until you actually do
24   it, it's not -- you know, you don't know that it's going to
25   work in this particular field.

1          This isn't like an example of a mechanical invention

2    where if you make a suggestion to attach one lever to one

3    piston, you sort of predictably know what's going to happen.

4    You know, here, until someone did it, they didn't know it would

5    work.

6          THE COURT:  Uh-huh.  Okay.  Well, thank you.

7          MR. CANNON:  Thank you.

8          THE COURT:  Let's move on to another issue, which is

9    the written description enablement.

10          So Promega has a challenge to Claim 62, is that

11    correct?

12          MR. MORTON:  I'm sorry, Your Honor.  I missed the

13    question.

14          THE COURT:  You have a challenge to Claim 62, a

15    written description challenge; is that right?

16          MR. MORTON:  Yes.  That's not the only challenge on

17    112.

18          THE COURT:  That's not your only written description

19    enablement challenge?

20          MR. MORTON:  Right, right.  We have brought

21    forward -- and we haven't brought forward, I should be clear,

22    all of our 112 challenges we have in the case, but for summary

23    judgment, we have brought forward a written description

24    challenge on Claim 62 and a separate written description and

25    enablement challenge on 62 and 66.

1          THE COURT:  Okay.  But I just want to discuss 62.

2          MR. MORTON:  Yes, Your Honor.

3          THE COURT:  So, briefly, what is that?  What is

4     your --

5          MR. MORTON:  Sure.  62 is a fairly straightforward

6     analysis, Your Honor.  The claim, Claim 62, as we all know,

7     covers a method of nucleic acid sequence analysis, which the

8     Judge has construed as -- Your Honor has construed as any

9     method of obtaining information about a sequence.

10          So it's not limited to the particular sequencing

11     method in the patent or any other method, but you do have to

12     have the ability to obtain information about a genetic

13     sequence; otherwise, the claim is basically useless, the method

14     is useless.

15          So, there's only one method disclosed in the patent,

16     and it's Sanger sequencing.  And the actual sequencing

17     invention, as an aside, was just -- was a twist on Sanger

18     sequencing, to go from four lanes to one lane with

19     fluorophores.

20          But, in any case, there's one method disclosed,

21     sequencing, and the information you're obtaining is the

22     sequence of nucleotides.

23          There are a number of other methods, of course, Your

24     Honor, but one huge class of methods, in particular, which all

25     involve using the PCR and all involve analysis of the human

1    genome.  And this is an entire universe of methods, and we've

2    set forth in some detail that, of course, are not mentioned in

3    the specification.  And, of course, they could not be because

4    they had not been invented at that time.

5              And so, really I think what this dispute comes down

6    to is -- the defendants keep saying in the briefing:  Well, the

7    claims don't require PCR.  They don't require that.  It doesn't

8    say PCR in the claims.  Of course it doesn't.  That's not our

9    argument.  Our argument is that the claims that they were able

10   to get through reissue and the constructions they have asked

11   for and obtained now cover PCR and every variety of it.  And

12   that's how they captured Promega's products for infringement.

13             And so, once you've done that and gotten that broad

14   claim, you have to have a written description for what the

15   claim now covers, and what it covers are methods of analyses

16   for obtaining information about a genetic sequence.

17             And in any PCR method, and certainly in the methods

18   we've put forward that Promega has used, what you're trying to

19   get is the length of a strand, length of the STR strand.

20   That's the information you're trying to seek.  And the Judge

21   has pointed that out.  You've pointed that out in prior orders.

22             The only way that you get to that information -- you

23   don't get that information by coupling a fluorophore to an

24   oligonucleotide and sending it off into the human genome to

25   hybridize.  If you do that, zero information.  You have to do

1    all the PCR steps and all the things we've put forward that

2    were invented later by Nobel prize winner Kary Mullis and also

3    by Promega.  None of that is in the spec.  It's undisputed.

4         THE COURT:  Isn't there tension between this argument

5    and your obviousness argument?

6         MR. MORTON:  No, Your Honor.  There's a very simple

7    answer to that, and that is when you have a broad genous claim

8    like these are, it is important that -- you know, we have rules

9    to combat that and to make sure that it's fair and make sure

10   you actually invented this broad genous.

11        And the issue that I think you're raising, which is

12   very clear in the law, is that when you have that claim and

13   it's a genous claim, one species --

14        THE COURT:  But your basic position is that the Smith

15   patent makes it obvious how you use the chemical formulas in

16   the patent to do sequencing.

17        MR. MORTON:  True.

18        THE COURT:  So PCR is not one of these obvious

19   methods?

20        MR. MORTON:  No, Your Honor.  What the '800 patent

21   shows is sequencing.  It's Sanger sequencing, now using a

22   fluorophore, and that -- and the information you're trying to

23   obtain is the sequence.  One species of that kind, one method

24   in the prior art will invalidate a genous claim to all methods.

25   That's the obviousness analysis.

1    Going forward on the 112 analysis, you have to

2  describe the full scope of the claims, support the full scope

3  or enablement.  We're talking about written description right

4  now.

5    So that ensures that if you are going to get a genous

6  claim, there really can't be any species of that genous in the

7  prior art, and you really have to fully describe what you've

8  done in order to support that entire genous.  So that's the

9  distinction.

10    THE COURT:  No, I was thinking of the '800 patent.

11    So given the '800 patent, isn't it your view that the

12  use of this for sequencing is either obvious or it's

13  encompassed within the Smith claims or what?

14    MR. MORTON:  Absolutely.

15    THE COURT:  Where does PCR fit in to that?

16    MR. MORTON:  The '800 patent is prior art, discloses

17  a method of nucleic acid sequence analysis, which is

18  sequencing.  PCR and the rest of that stuff is other methods of

19  nucleic acid sequence analysis that obtain different

20  information in a different way.

21    THE COURT:  And the '096?

22    MR. MORTON:  Well --

23    THE COURT:  Does that also obtain information in

24  different ways?

25    MR. MORTON:  Not different than the '800.  The method

1    that's in the '096 is sequencing, Sanger sequencing, trying to

2    get the sequence of nucleotides.

3              THE COURT:  But there are differences between the

4    description of uses in the '096 and the '800, right?

5              MR. MORTON:  There is some different subject matter

6    in the specification.  If we focus on the claims, as we must

7    here -- and this is a part of the problem of the whole case and

8    a part of the problem with this patent, Your Honor -- is that

9    the claims of the '096 patent are in no way limited to the

10   actual invention of the '096 patent.

11             THE COURT:  Yeah, but that's a separate point from

12   the overlap with '800.  Right?

13             MR. MORTON:  I think it's a related point.  Because

14   the claims are so broad, the '800 clearly anticipates.  And

15   they are also so broad, they clearly do not have written

16   description to discover the breadth of the claim.

17             THE COURT:  But you're saying they're not broad

18   enough to embrace PCR?

19             MR. MORTON:  Well, Your Honor, the Court has given us

20   constructions and told us that we infringe, right?  So, so many

21   things in patent cases come down to claim construction, and

22   we've had our fight over that, and the Court has ruled on that.

23             THE COURT:  Okay.  Well, let me hear from Mr. Cannon.

24             MR. CANNON:  Your Honor, I think you pointed out

25   something very interesting, which is, from my perspective, some

1    cognitive dissidence in Promega's position, is where, on the
2    one hand, for obviousness, they want to say by 1984, everything
3    in the '096 patent was just completely obvious to those of
4    ordinary skill, therefore, all the claims should be invalid,
5    and then they shift gears in the 112 arguments and say no one
6    of ordinary skill would know how to actually practice the
7    claims of the '096 patent.  And, Your Honor, those are -- those
8    doctrines are in tension.  You can't, on the one hand, say the
9    claims are just obvious, everyone knows how to do them, and at
10   the same time say they're not enabled and no one knows how to
11   do them.  I mean, the two doctrines, there is tension between
12   them.
13           With respect to the 112 issues, just like
14   obviousness, the burden here is on Promega with clear and
15   convincing evidence to convince Your Honor that the claims are
16   invalid, and I submit that on the briefs, they have not done
17   that.  They have made a lot of attorney argument, but they have
18   not shown that these claims are invalid as a matter of law by
19   clear and convincing evidence.
20           And with respect to PCR, that was developed later,
21   but the claims do not require PCR.  PCR is a tool that can be
22   used, that uses the '096 patent invention, but Life and Caltech
23   don't claim to have invented PCR.  It's like you take an
24   invention or you take the '096 invention and you use a
25   high-powered computer to analyze the data.  There's no -- there

1   may be infringement, but there's no claim that Life and Caltech
2   invented the computer that analyzed the data.  And I think
3   that's the issue with written description.
4         We're not claiming to invent PCR.  PCR is a
5   later-developed tool that increases the efficiency here and
6   certainly is a helpful, you know, biochemistry tool, but it
7   uses -- when PCR is used for sequence analysis, like the STR
8   kits of Promega, it uses the '096 patent.  Therefore --
9         THE COURT:  That's the important --
10        MR. CANNON:  -- there's infringement.
11        With respect to enablement, that's slightly different
12  under 112.  The enablement issue is -- the question is:  Does
13  one of ordinary skill require undue experimentation to practice
14  the claims?  And it's quite fact-based.  And, here, there is no
15  real facts.  What you need is people of ordinary skill and
16  experts to say:  Here is all the experimentation one would
17  require to practice these claims.  And that's what's missing
18  from Promega's briefs.
19        And, in fact, the '096 patent has technical examples
20  in it that show the '096 patent being practiced.  And so,
21  therefore, we feel it meets the enablement requirement as a
22  matter of law or, at a minimum, there's an issue for trial.
23        THE COURT:  Okay.  Thank you.  Thank you, Mr. Cannon.
24        So, Mr. Morton, let's move on to infringement, since
25  you mentioned it, and Mr. Cannon also.

1           So you have conceded infringement, right?

2           MR. MORTON:  Yes, Your Honor.

3           THE COURT:  Okay.  Now, what about -- now, that's

4    direct.  What about indirect infringement?  I don't -- well,

5    you know, induced infringement?  Is that an issue still in the

6    case?

7           MR. MORTON:  No, Your Honor.  I mean, my client does

8    have over a thousand products in this case, and it took us a

9    long time to figure all this stuff out, but we have tried to

10   listen to Your Honor's order to find a way to resolve the

11   issues of infringement and damages without a trial, and we have

12   streamlined the case the best that we can.  So we are --

13          THE COURT:  So induced infringement is not in the

14   case anymore?

15          MR. MORTON:  Is not an issue.

16          THE COURT:  Okay.  So there is no infringement issue

17   at the moment, or at least --

18          MR. MORTON:  Right.  I mean, the only --

19          THE COURT:  -- after my rulings.

20          MR. MORTON:  There are two slight qualifications

21   which I'll give the Court.

22          THE COURT:  Okay.

23          MR. MORTON:  One would be if the only claim left

24   standing was Claim 62.  That's a method claim.

25          THE COURT:  Right.

1          MR. MORTON:  It cannot be infringed by use outside
2     the United States.
3          THE COURT:  Right, right.
4          MR. MORTON:  That would knock out somewhere around
5     half the sales.  That's simply an accounting issue that we can
6     deal with later.
7          THE COURT:  Right.
8          MR. MORTON:  The other issue would be if only Claim
9     67 was left standing -- that requires four different labels,
10    four colors, basically, and not all the products have that.  I
11    don't think there's a dispute over that either.  If Claim 67
12    was the only one left standing, it's just a matter of
13    accounting.
14         THE COURT:  Okay.  Thank you.
15         Mr. Cannon, do you have anything to add to that?
16         MR. CANNON:  No, Your Honor, I don't believe there's
17    any infringement issues left in the case.
18         As counsel said, there may be an accounting after the
19    fact, but the basic acts of infringement, the technical aspects
20    of the product, the manufacture in the U.S., the sales of
21    customers, the use by customers, that's all been resolved.
22         THE COURT:  Okay.  Well, don't sit down.
23         The last issue I want to discuss is damages.  And so,
24    with Mr. Greene out of the case, what would -- do you have
25    other evidence of damages or --

1    MR. CANNON:  Well, we submitted a brief on that, Your

2  Honor, and there's two parts to damages.  One is entirely

3  undisputed.  That's the contractual damages.  Based on Your

4  Honor's *Daubert* ruling, there's a royalty base that is

5  essentially undisputed.  It's an accounting issue.

6    THE COURT:  Well, stop.  When you say -- yes.  So

7  there are, of course, two issues.  I am not being clear.

8  There's the royalty base and there's the royalty rate.

9    On the royalty base, there are disagreements, aren't

10  there?

11    MR. CANNON:  Not anymore, Your Honor.  There's a --

12  if -- now that infringement has been conceded, we know what the

13  sales are, and so we know what the royalty base is.

14    With respect --

15    THE COURT:  Okay.

16    MR. CANNON:  -- to outside the field of use, which is

17  sort of patent infringement damages --

18    THE COURT:  Right.

19    MR. CANNON:  -- as Your Honor knows, there was a 2%

20  concession by Promega's expert.  However, Promega's expert

21  conceded a little bit more than that.  Promega's expert

22  conceded that the royalty rate ought to be a range between 2

23  and 4.4%.

24    THE COURT:  Now, before you get to that, let me just

25  make sure I understand.

1    So the royalty base -- and would this be both for

2    damages but also for a future royalty rate until the patent

3    expires?

4         MR. CANNON:  The future only applies to the contract,

5    the sales within the contract.  For sales outside of the

6    contract, we would seek an injunction.  And so, the damages

7    would just be for past infringement up to the date of judgment.

8         THE COURT:  But you could ask or I could order a

9    future royalty in lieu of the injunction, right?

10        MR. CANNON:  If there was a judgment, then, of

11   course, we would have a hearing as to whether an injunction or

12   a future royalty rate would apply.  But it's our position right

13   now that an injunction is appropriate for the sales outside the

14   scope of the contract.

15        THE COURT:  Why do you distinguish between outside

16   and inside with regard to injunctive --

17        MR. CANNON:  Because the parties are competitors,

18   Your Honor.

19        THE COURT:  What?

20        MR. CANNON:  The parties are competitors in the

21   marketplace, and they negotiated a cross-license agreement with

22   a particular field of use.  They agreed to cross-license each

23   other for certain types of sales.  Outside that, there was no

24   license and the parties compete.

25        THE COURT:  Well, I thought the entire case was about

1  the non-field of use.

2          MR. CANNON:  It's --

3          THE COURT:  No?

4          MR. CANNON:  No.  The damages are split in two ways.

5  So Promega sells three classes of products.  One class of

6  product, a portion of them -- it's about half the revenue.  So

7  it splits about 50/50, roughly.  About half of Promega's sales

8  are what we call within-the-field-of-use sales.  They are STR

9  kits for forensic and paternity-type --

10          THE COURT:  Right.

11          MR. CANNON:  -- situations, like crime scene

12  analysis, things like that.  Those are not subject to an

13  injunction.  Those are subject to a 2% royalty for past use.

14  Plus, I think there's a late penalty fee in the contract.  But

15  then there's -- and then they would be subject to an ongoing 2%

16  royalty rate.

17          THE COURT:  You mean the 2006 cross-license has

18  expired?

19          MR. CANNON:  No, it has not.  It is in effect, and we

20  are seeking to enforce it.  And Your Honor has found that

21  Promega was in breach of that contract in the April summary

22  judgment ruling.  So we would seek contract damages --

23          THE COURT:  But you've said within the field of use,

24  you just want the 2% --

25          MR. CANNON:  Correct.

1          THE COURT:  -- to continue?

2          MR. CANNON:  Correct.

3          THE COURT:  Okay.  And outside?

4          MR. CANNON:  Outside the field of use, we had a

5   damages expert that came up with a hypothetical negotiation

6   that Your Honor rejected, and so we turned to what we see as a

7   concession, what Your Honor recognized was a concession.

8          THE COURT:  4.4%?

9          MR. CANNON:  4.4%, that's correct, Your Honor.

10         So we don't think a trial is necessary on damages,

11  that Your Honor can rule on the papers that 4.4% applies to the

12  royalty base.  And if there's any -- if there happens to be a

13  dispute about the royalty base -- I don't think there will be,

14  but if there is one -- we think we could submit that on the

15  papers to Your Honor.

16         THE COURT:  Okay.  Thank you.

17         So, Mr. Morton, let me ask you about the 4.4%.  My

18  reading of Mr. Degen's expert opinion is that he says that

19  the reasonable range is 2 to 4.4%.  And in deriving the 4.4%,

20  he relies on this 12% figure, which was in the Greene report,

21  but it was also testified to by Dimond.

22         So Degen 's range, as I read his report, his range is

23  actually based on Promega evidence.  And so, why shouldn't that

24  be the range?

25         And then I don't know how -- once you have a

1    reasonable range, I don't know how you pick an intermediate

2    number.  I don't think Degen has any idea either.  And my

3    inclination would be -- so tell me what's wrong with this.

4          My inclination would be to give Life Tech, you know,

5    if it proves -- if its patent is not invalidated, to give it

6    4.4%.  And my thinking is -- I'm thinking of the Supreme Court

7    decisions in *Story Parchment* and *Bigelow* -- and there are a lot

8    of recent cases, some -- I have written opinions in cases --

9    that while it's essential for the plaintiff to prove injury by

10   a preponderance of evidence, same as any other critical issue,

11   that would be adequately proved if a valid patent is infringed.

12   That's proof of injury.

13         But then the Supreme Court and other courts have said

14   when it comes to actually calculating damages, you don't have

15   to be as rigorous as you do in determining injury because it's

16   very difficult to estimate damages.  And after all, if it

17   weren't for the violation, you wouldn't have this uncertainty.

18         So we resolve uncertainty against the defendant.  And

19   say if your own expert says 4.4% is the top of a reasonable

20   range, why shouldn't that, you know, be the rule?

21         Or, put it differently, what on earth would it try to

22   do -- if I said to the jury:  Well, we have this range, 2% to

23   4.4%, and your job is to pick the point in range?  Well, what

24   would they do?  What would they have to go on?

25         Now, I could imagine a damages case developed in a

1    way -- I mean, the right way to do these things is first you

2    look at the infringer and you say:  How much would the

3    infringer be willing to pay?  Because you look at the

4    importance of this product that he's making, that's infringing,

5    how important is it?  What would he do if he's suddenly

6    forbidden to make it, sell it because he has no license?  What

7    does he do?  Can he substitute?  And from that, you can, you

8    know, you can say:  How much, you know, would he pay?

9            And then you can look at the other side, at the

10   patentee, and say:  Well, how low would you go here?  You want

11   to make some money from this product.  You don't want to make

12   it yourself, or maybe you do want to make it yourself, which

13   would figure in the analysis, and that's how you set a range.

14   And maybe you can find a point in the range, but maybe not.

15           But, anyway, we don't have that sort of rich

16   evidence.  All we have is the 2 to 4.4%.  So what would I tell

17   a jury?  If I ask them to pick a point, what would I tell them?

18           MR. MORTON:  That's a fairly long question, Your

19   Honor.

20           THE COURT:  Sorry.

21           MR. MORTON:  So if I am understanding the

22   hypothetical here, the hypothetical is we actually show up to

23   trial with our expert testifying on damages and them relying on

24   our expert.

25           So, I mean, first of all, I have to point out that it

1    is their burden to prove, and they don't have any ability to

2    prove a higher than 2%.  So --

3              THE COURT:  I regard Degen's expert report as your

4    concession.  I don't think they have to prove anything.

5              Your own guy, who I said was qualified to testify, he

6    says 2 to 4.4% is a reasonable range.  Now, I accept that and I

7    don't want to look beyond it.

8              And so, that's why I am asking you, is there any way

9    to determine a point in that range?  Because if not -- as I

10   say, my inclination is to say:  This is the range.  We resolved

11   doubts in favor of the plaintiff.

12             There's certainly nothing outlandish about 4.4%.  To

13   know whether it's excessive, you'd have to know an awful lot

14   about this market, and there isn't anything.

15             So, as I say, what would I tell a jury?

16             MR. MORTON:  Well, Your Honor, I guess I -- I mean, I

17   disagree that there's not more information.

18             THE COURT:  Okay.  What's the more information?

19             MR. MORTON:  Mr. Degen's analysis in his report.

20             THE COURT:  I didn't see anything in his report which

21   justifies 2% over 4.4%.

22             MR. MORTON:  His position, as I understand it, Your

23   Honor, is that there's no difference between the 2006

24   cross-license circumstances and the hypothetical negotiation in

25   2012.

1    THE COURT:  How could he possibly say that?  I don't
2    understand that.  In order to say nothing's happened between
3    2006-2012, you'd really have to study this industry, and his
4    report is very thin.  So I just -- I don't see that.

5    And, also, his conclusion is the reasonable range is
6    2 to 4.4%.  That's what he said.  If he gets up and says
7    something different, he's just going to be torn apart, right?
8    The cross-examination will be actually devastating.  You say:
9    Well, you said 2 point -- you know, you said in your report and
10   your deposition and so on, you said this, and you didn't argue,
11   well, it's really 2%, but maybe you could say 4.4.

12   You base the 4.4 on -- to a significant extent, on
13   the principal witness for Promega, who's Dimond.  Now what are
14   you going to do?  Cut Dimond's legs off in order to push the --
15   I just don't see it.

16   MR. MORTON:  So let's talk about how this trial would
17   look, Your Honor.

18   THE COURT:  Okay.

19   MR. MORTON:  I think, as I stand here now, that both
20   men would testify and they would go into this actual testimony
21   of Dr. Dimond's that you're talking about, and that actual
22   testimony, what it's about is the license of Promega's patents
23   to the defendants.  Right?  And that in 2006 was 5.5%.  And
24   what the argument was later was it should be 12.

25   And the reason was that there would be a difference

1    in those two negotiations, and that difference would be Promega

2    was willing to take a much lower percentage in 2006 in order to

3    extract other considerations.  In this case, the most important

4    being instrument considerations, that Life would not change the

5    instruments in any way that would prejudice Promega's ability

6    to sell its products or for people to use them.

7              So that would be the testimony of Mr. Dimond, that

8    there was a difference, and that's why you should get a higher

9    rate later on Promega's patents.

10             I believe Mr. Degen's analysis is --

11             THE COURT:  Well, now, you wouldn't have -- Dimond

12   has not been qualified as a damages witness, damages expert.

13             MR. MORTON:  No, he's not our damages expert, but

14   you're talking about --

15             THE COURT:  So what would he -- how would he be

16   backing down from his 12%?  Or would you say that Degen had

17   misunderstood?

18             MR. MORTON:  Not at all, not at all, Your Honor.  I

19   mean, Randy Dimond was testifying -- the testimony that we're

20   talking about, that you're saying Mr. Degen's relying on and

21   that they could rely on, was his testimony -- and he could

22   provide testimony as a fact witness, as with knowledge of

23   negotiations that actually occurred -- that that was -- that's

24   the difference between those two times.  The difference is

25   Promega was taking less --

1    THE COURT:  Then why did Degen say that 4.4% was the

2    top of the reasonable rate?  Did he misunderstand what Dimond

3    was saying?

4    MR. MORTON:  No, I don't think so.  In fact, Mr. --

5    THE COURT:  Well, then why did he -- but if Dimond --

6    if what you're saying with Dimond, Dimond's 12% is irrelevant

7    to the top of the range, but Degen thought it was the -- it was

8    Degen's basis for calculating top of the range.

9    MR. MORTON:  This is exactly why there would need to

10   be a jury trial here.  I mean, the way Mr. Degen --

11   THE COURT:  For Degen to back away --

12   MR. MORTON:  No.

13   THE COURT:  -- and say he's been misunderstood?

14   MR. MORTON:  No, Your Honor.  Mr. Degen's point on

15   raising the 4.4 was specifically to say if the jury disbelieved

16   the testimony of Dr. Dimond, that the difference was the

17   instrument concessions.  If the jury looked at the -- that

18   testimony differently and rejected that consideration, then

19   they could consider a higher rate.

20   It was based on how the jury would interpret other

21   factual evidence.  That's how he got to 4.4.  His actual

22   opinion and his view of it was 2%.

23   THE COURT:  He didn't say that.

24   MR. MORTON:  Okay.

25   THE COURT:  Did he?  You point out where he said it's

1    really 2%, but if, you know, if you don't believe Dimond, it's:
2    Well, I'll give you 4.4%.  I don't see -- look, I may very
3    well be mistaken about this.
4                    MR. MORTON:  Sure.
5                    THE COURT:  But I'd like you to -- but if I am, I'd
6    like you to, you know, point out where he ever -- I mean,
7    obviously, he starts with 2%.  That's the obvious minimum.
8    Even though I think you suggest the jury could find zero
9    percent.  That would be preposterous, obviously.  But he starts
10   with 2%, but he goes up to 4.4, and I -- now you're saying,
11   well -- and I understand how this could be a perfectly good
12   argument.  If what he said was it's 2%, but, you know, if the
13   jury mistakenly disbelieves Dimond, then it could be as high as
14   4.4%, if that's what he said, fine, but I don't think he said
15   that.  I mean, I can obviously determine that, but --
16                   MR. MORTON:  I mean, I -- here's how I -- here's the
17   best I can do for you, Your Honor.
18                   THE COURT:  Okay.
19                   MR. MORTON:  I do think he gives the 2 to 4.4% range,
20   but you're asking how would a jury pick a number within that
21   range, and he does explain that the basis for having that range
22   and the basis for 4.4 is this issue with the concession on the
23   instruments.  That's how they would have to do it.
24                   His analysis of the hypothetical negotiation shows
25   that there is no difference between the 2006 negotiation and

1    the 2012 negotiation, but he's allowing for interpretation of
2    Dr. Dimond's testimony from this other trial.
3           THE COURT:  Okay.  Well, put that aside.  How can he
4    say there's no difference between 2006 and 2012?  Don't you
5    have to do a study and say -- now, like Greene,
6    unfortunately -- I mean, Greene started down the right path,
7    then he fell off, in my opinion.  But he was looking at other
8    licenses.
9           So you could imagine Degen having said:  Well, let's
10   look at the evolution of licensing provisions over this
11   six-year period, what was happening in the industry, what was
12   happening in licensing generally.
13          After all, one thing that's going to affect royalty
14   rates over a period of time would be the expected inflation
15   rate, for example.  So -- or it could.  I mean, it may not.  It
16   depends what you think is going to inflate.  Maybe this product
17   is not going to inflate, but maybe there's general inflation.
18          Anyway, how you think the price of the product will
19   change and so forth, so that one would think it would be
20   essential evidence to explain why 2% would still be the right
21   rate.
22          MR. MORTON:  Well, if I could step through the
23   analysis --
24          THE COURT:  Yeah, sure.
25          MR. MORTON:  -- briefly, Your Honor?

1    THE COURT:  Yeah.

2    MR. MORTON:  There's a negotiation in 2006 for what

3  would be the appropriate rate if the reissue patent issued with

4  valid infringed claims.  There's no way to have a more

5  applicable license to compare it to, and we've already been

6  over the fact that it's far more applicable than the other

7  license.  So, really, the only license to look at is that, the

8  2%.

9    Mr. Degen also did go through what were the

10 circumstances -- and he's responding to Mr. Greene, by the

11 way -- and responded by saying the commercial circumstances

12 were also the same.  The sales inside the field of use, very

13 similar to the sales outside the field of use in 2012.

14 Profitability, basically the same.  He went through that

15 analysis and showed the commercial reality was that it was the

16 same for outside the field of use in 2012 as it was inside in

17 2006.

18    On the issue that you raised as far as the inflation

19 rate, I think it's similar to some of the stuff that Mr. Greene

20 raised about increased demand and what have you.  I mean, I

21 think that's addressed more by the base.  If there is higher

22 sales, there's a higher base.  If inflation has caused the

23 total price of products to go higher, then you'd apply the 2%

24 to a higher total revenue.  I think those issues are addressed

25 by that, Your Honor.

1      THE COURT:  Well, it's not obvious that the royalty

2  rate is unrelated to the royalty base, right?  I mean, the fact

3  that the aggregate revenue is increased -- I suppose there's

4  tremendous demand for this product, and so sales have increased

5  a lot.  And you're saying:  Well, okay.  So 2% is going to

6  yield the larger license revenue because -- total revenue.  But

7  at the same time, the fact that there is such demand for this

8  product may tell the patentee:  Wow, you know, this is a hot

9  product.  I think I can squeeze more out of them.  After all,

10  3% of $10 million may strike them as very affordable compared

11  to 2% of a hundred thousand dollars.  Right?

12      I have no idea how these things work at all.  But I

13  would think you'd want to look at -- after all, Greene start --

14  as I say, he started down the right path, looking at other

15  licenses, comparable -- they weren't comparable, unfortunately,

16  but that -- you do want to look at licensing practices.

17      You can ask consulting firms, what do they advise.

18  There are loads of, you know, business consultants who offer

19  opinions on this sort of thing.  There's a lot that you can do

20  that I -- I don't think Degen did anything.

21      MR. MORTON:  Two points, Your Honor, in response to

22  that.

23      First, I believe he directly considered that the

24  demand for the products inside the field of use in 2006 was

25  substantially the same as the demand for products outside the

1    field of use in 2012.  So he accounted for that as part of his

2    reason why the hypothetical negotiation would be the same as

3    the actual negotiation.

4              THE COURT:  But there are other companies in this

5    field, so it's not just Promega and Applied Biosystems,

6    presumably.  Are there a lot of companies?

7              MR. MORTON:  There are a lot of companies generally.

8    In this precise market, I don't think there is.

9              THE COURT:  The identification, the DNA

10   identification?  Is Promega the dominant firm?  Is that --

11             MR. MORTON:  We wish so, Your Honor.  We're

12   setting --

13             THE COURT:  Working on it.  Okay.

14             MR. MORTON:  Yes.

15             THE COURT:  Okay.  Thank you, Mr. Morton.

16             So, Mr. Cannon, do you have anything you want to say

17   on it?

18             MR. CANNON:  I think Your Honor got it exactly right.

19   It's actually pretty simple that Degen propose telling the jury

20   that a reasonable royalty was the range of 2 -- between 2 and

21   4.4%.  So we would submit 4.4% is the right number to pick, in

22   part based upon what Your Honor recognized, that the burden of

23   ambiguity, once injury has been established, does lie with the

24   actual infringer here, and that's Promega.  And I think it

25   would be very hard for Degen to back away from the range, now

1    that he said that is an appropriate range.  So we'd request

2    that the top end of the range be picked.

3              THE COURT:  Okay.  Well, this is a difficult

4    question.  I will think about it.

5              So, one loose end from earlier.  You can sit down,

6    Mr. Cannon.  One loose end.  It would be helpful if the parties

7    could submit, either separately or together, an indication of

8    where in the record, if it is in the record, I could find the

9    policy handbook that you mentioned, the employment contracts

10   for the inventors, and the joint research agreement between

11   Applied Biosystems and Caltech that was referred to.

12             And I'd be grateful if you could -- you know, I want

13   to try to dispose of these summary judgment motions quickly, so

14   I'd be grateful if you could get that information to me by,

15   say, 9:00 o'clock tonight.  You know, I am not asking for any

16   analysis, just the documents.

17             Okay.  Are there any other things that we should

18   discuss before we break up?  Mr. Cannon?

19             MR. CANNON:  Brian Cannon again.

20             I don't think either side has received any

21   information from the neutral Dr. Lee, and we were wondering

22   whether that was going to come directly from him or be filed,

23   come from the Court.

24             THE COURT:  Yeah, let me ask my law clerks.

25             (Court conferring with his law clerk.)

1      THE COURT:  Okay.  Yes.  With regard to Dr. Lee, so

2  we asked him to do a revised glossary, and we'll get that to

3  you today.  And we'll also get you today or tomorrow various

4  materials that he sent us, including some visual aids and other

5  materials.  So you'll have that well in advance of the

6  deposition.

7      MR. CANNON:  Okay.  Thank you.

8      THE COURT:  And unless my law clerks have any --

9  pardon?

10     (Court conferring with his law clerk.)

11     THE COURT:  The check, right, yes.  He did submit a

12 bill.

13     MR. CANNON:  He did, and the check is in the mail.

14     THE COURT:  Okay.  Check's in the mail.  Okay.  All

15 right.  So if there's nothing further, we'll adjourn.

16     And thank you very much.  It's very helpful to me.

17 We will rule promptly on the summary judgment motions.

18     (Proceedings concluded.)

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4

5            I, Colleen M. Conway, do hereby certify that the

6    foregoing is a complete, true, and accurate transcript of the

7    Continued Daubert proceedings, Pages 184-258, had in the

8    above-entitled case before the HONORABLE RICHARD A. POSNER,

9    one of the Judges of said Court, at Chicago, Illinois,

10   on June 7, 2013.

11

12

13        _/s/ Colleen M. Conway, CSR,RMR,CRR_        _06/07/13_

14            Official Court Reporter              Date
             United States District Court
15          Northern District of Illinois
                 Eastern Division
16

17

18

19

20

21

22

23

24

25